Good morning, and may it please the Court, my name is Rachel Homer on behalf of the United States. I'd like to reserve three minutes for rebuttal. Alaska law limits non-economic damages in medical malpractice suits where the patient is severely injured to $400,000 unless the plaintiff can show that the physicians were reckless. This is a tragic case, there's no dispute about that, but the physicians who treated Ms. Rivers were merely negligent, not reckless. Under Alaska law, recklessness requires an unreasonable risk or an extreme risk of physical harm that is substantially greater than that which is necessary for negligence. In other words, the physicians must have consciously disregarded a substantial and unjustifiable risk. Here, the physicians' conduct in this case just did not rise to that level. In fact, the District Court criticized the physicians for adhering too strictly to the standard of care here, that's the modified Duke criteria. Adhering too strictly to the standard of care can't be recklessness. It's simply not such an extreme departure from the standard of care that would be necessary to support a finding of recklessness. Now, counsel, plaintiff makes much of the fact that there were two experts, Dr. Levy and Dr. Hosea, who both testified that in their opinion that the actions here were reckless. I did not see your brief, opening brief or reply brief, discuss Dr. Levy or Dr. Hosea, so why are the plaintiffs wrong about that, about relying on those two experts? Those two experts did testify to that. The government's various experts provided contradictory testimony. We don't challenge the District Court's specific factual findings of the areas in which the treating physicians erred in treating Ms. Rivers. We do challenge the application of the law to those facts, and we think the instances that the District Court identified of error simply don't support a finding of recklessness. But here, again, we had two experts who testified that in their opinion, and I've read the testimony of both, they seemed to know the record extremely well when they testified. Both opined that the actions of the doctors here were reckless. Why couldn't the District Court, in making its determination, rely on the testimony of those two experts? The District Court's entitled to rely on that testimony, but we think that finding is clear error. Here, the District Court found four instances where the treating physicians erred. The treating physicians gave insufficient weight to Ms. Rivers' high sedimentation rate at discharge. They gave insufficient weight to her continued splinter hemorrhages. They did not retain the blood cultures for a long enough time, and they failed to schedule a follow-up echocardiogram. This was a jury trial, and the fact finder was a jury, and they decided to rely upon the two experts provided by the plaintiff in the underlying suit and disregard the testimony of two other experts. Would we be having the same discussion? I think we would, Your Honor. Again, we acknowledge that this is clear error review. It's an application of the law to the facts, and the plaintiffs were qualified to testify as they did. Excuse me, the plaintiff's experts were qualified to testify as they did, but we believe that's an error. We believe that the four instances of deviations from the standard of care that the District Court identified simply don't amount to outrageous enough conduct to support a finding of recklessness. You know, you have basically two different plausible conclusions from this disputed evidence, and the District Court made that determination, cited on one side of plausibility. How would we reverse that as clear error? Because we're kind of talking in principles at this point, but how can that be clear error given the two different sides and the actual testimony that was here? So the Alaska Supreme Court has addressed the issue of recklessness versus negligence multiple times, and in each of those instances it has made it clear that recklessness requires just an extreme departure from the relevant standard of care. It requires outrageous conduct. It requires a conscious disregard. The metaphor that the Alaska Supreme Court has used and that there were statements used and that has actually been real facts, not a metaphor, in at least two cases, is if a plaintiff, excuse me, if a party sees a red light or a stop sign, acknowledges it, and then decides to blow through traffic anyway, that's recklessness. Whereas if a party fails to see the red light or stop sign through an advertence or distraction and drives through an intersection, that's negligence. Here, the physicians saw the indications that she might have infective endocarditis. They followed the proper standard of care. They followed it imperfectly, but they identified the proper standard of care, and they followed it, you know, reasonably well. I think the other side would say, well, you actually blew through the stop sign because given these indicia of this woman's condition and, you know, sending her back home, not having a follow-up visit, which would have changed things, and given the severity of this kind of diagnosis, that isn't this a blew-through-the-stop sign, and that's a judgment that the district court made? We don't believe so. We believe that the physicians here, they saw the yield sign. They saw the diagnosis of possible IE given at Bethel Hospital by Dr. Woods, and what they did at that point is follow the standard of care, identify the modified Duke criteria, treat her with antibiotics for four days while they conducted the various additional diagnostic tests that they were supposed to complete. They took two initial echocardiograms. They reviewed her blood cultures. They monitored the four minor criteria for IE that she was on. Those minor criteria had resolved within four days of antibiotic treatment. They rejected the diagnosis of IE. Again, the modified Duke criteria allows rejection of a diagnosis of IE if the syndrome resolves within four days. We don't dispute that the district court erred by not, excuse me, that the physicians erred by not paying sufficient attention to the other indications of infection that are not part of the modified Duke criteria, but we simply put forward that adhering too strictly to the standard of care, which is what the district court said on pages 16 and 17 of the excerpts of record, which is what the district court said the physicians did wrong, adhering too strictly to a standard of care simply can't support a finding of recklessness. Now, counsel, I appreciate what you're asking us to do and the difficulty of the task that we're on, recklessness versus negligence. First question, I have a couple. First question, do you know of any cases, published or unpublished, where this court has reversed a district court's factual determination of recklessness? Certainly not applying Alaska law. About any law anywhere? I'm not familiar with any. So this would be the first time, as far as you know. As far as I know. The second question is that I understand the argument you're making about that they were following the standards of care and it's wrong to punish them, in a sense, for saying that. But this is clear error review. So what we have to do now is we have to say what did the district court just totally botch. For example, the district court said, I'm relying on witness Smith, because witness Smith said this. Witness Smith, in fact, didn't say that, was nowhere in the transcript. Okay, then we can start talking about clear error. But here, that's why I keep asking about these two experts. I know it's tough for you, but the two experts testified it was recklessness. And I've read the transcript. That is what they said. One of them said it was crazy what happened here. So if the district court is relying on these two experts, both of whom say it was reckless, one of them says it was crazy, where's the clear error if that was the, and no one's arguing that testimony was that's in the record. So again, how did the court clearly err if that is the evidence it was relying upon? I understand the difficulty that Your Honor is grappling with. The distinction between recklessness and negligence is a fact bound one and it's difficult. But the Alaska statutory scheme at issue here and the Alaska Supreme Court has consistently emphasized that this is a relevant distinction. We can't simply look at negligence and severe harm and say that that was recklessness. Here, we don't dispute that the plaintiff's experts did, that testimony is in fact in the record. We're not arguing that it was improperly admitted. But we think the basis of that testimony is essentially saying that because the harm to her was significant, it was reckless. And we just don't think that that's an accurate statement of Alaska law. I'm looking now at the district court's decision. Could you be more specific on what in the decision you think misapprehends the Alaska law? So the decision on page 21, that's where the paragraph on the bottom of page 21 and going to the top of 22, that's where the district court discusses this issue of recklessness, which again is relevant for the cap on non-economic damages. The district court states the standard for recklessness correctly, but we don't think really did the analysis necessary for that. The district court on pages 16 to 17 criticizes the physicians for adhering too strictly to the standard of care. And we think that's just not a faithful application of Alaska law. Adhering too strictly to the standard of care just can't be a sufficiently extreme departure from the standard of care to support a finding of recklessness, of conscious disregard or conscious indifference to the risk to the patient's health. For example, the court says, had Schnellenbacher been able to render an opinion ruling out, i.e. on the basis of his reading of the TEE, the court would have difficulty saying that they had created an unreasonable risk of physical harm. Is there something wrong with that determination? Yes, Your Honor. Under the modified Duke criteria, if Dr. Schnellenbacher, who was the cardiologist, could have read the echocardiogram in a way that ruled out IE, then they could definitively rule out IE. That is, the district court is conflating negligence and recklessness in describing the various ways that the physicians would have been able to rule out IE. If Dr. Schnellenbacher had been able to say she didn't have IE, then she wouldn't have had IE. Now again, in hindsight, we know that she did, and we know that the physicians were erroneous, and the government doesn't dispute that. But that sentence is a clear example of the district court demonstrating that it, even though it stated the standard for recklessness correctly, it just misunderstood what that meant. Could you give us an example in the medical malpractice context of a negligent act that did not amount to being reckless? Sure. I think the best example is this court's Bunting case. That applies Alaska law and asks the question of whether the physician there was merely negligent or was grossly negligent. The court used the definition for recklessness in defining grossly negligent in that context. In that case, the defendant was a physician who treated a patient who had been in a plane crash and was pulled out of a freezing river. The patient had low blood pressure, hypothermia, and a punctured lung, and the physician decided to treat his hypothermia first. That was the wrong treatment plan. This court acknowledged in hindsight the physician made the wrong choice and the patient ended up dying because of it. But the physician, given the knowledge that he had at the time, reasonably, although erroneously, treated the patient, and that just simply wasn't grossly negligent. I see that I'm heading into my rebuttal time, so I'd like to reserve the remainder of my time. You may. Mr. Henderson. May it please the Court, David Henderson for Ms. Gucic. To understand this case, you have to understand what medical students are taught. You know, if you hear that they're taught something in the first year of medical school, that when you hear hoofbeats, you don't think zebras. You look for the most common explanation first. They're also taught that you don't make up diagnoses that don't exist in medicine. Those two rules. In this case, those two rules were violated. Not only did the doctors think of something that doesn't exist, in this case pregnancy-induced vasculitis, which isn't a zebra, they thought of a unicorn and substituted the diagnosis on December 16, 2013 that Ms. Rivers had presumed, endocarditis, with all her signs and symptoms. And I briefed this, what is endocarditis? It's an infection of the heart. It's a deadly condition. Bacteria, you know, they gather on the heart valve. Ms. Rivers had a prior prosthetic valve for rheumatic fever. Once vegetation develops, if it's not treated with antibiotics, it breaks off, it goes to the brain, it causes strokes, it causes catastrophic injury. You know, you talked about the two experts. Dr. Levy, who's a professor at the is the most lethal entity we treat. He said it's more lethal than heart attacks, and when we treat it, we take it very seriously. And Dr. Jose testified that, let's be clear, you have 100% chance of dying if you don't treat this. And if you don't treat it, you're going to have a stroke. You're going to have an embolism in some place in the body. You're going to develop heart failure, and you're going to die from that. So in that context, when they released Ms. Rivers on December 23rd of 2013 from the hospital, her syndrome had not resolved. Contrary, and they keep saying that they followed the standard of care, but they didn't follow the standard of care. The modified due criteria, as Dr. Jose testified, and he was the only independent infectious disease doctor to testify in this case, went to Harvard, trained at Harvard, trained at Mass General Hospital, it's in the record. He testified that you don't even use this criteria for culture-negative endocarditis. Because when they took the cultures in Bethel on December 16th, and she was diagnosed with presumed endocarditis because she had splinter hemorrhages, she had osteo nodes, she had a high white blood count, she had a high BNP rate, she had a high SED rate. All the signs, classic signs, and both the experts said right then and there she has endocarditis, she needs to be treated for four to six weeks with antibiotics. When she gets to Anchorage, she starts to get better, which is exactly what you would expect with being treated with antibiotics, and they start coming up with stuff that doesn't exist, like pregnancy-induced vasculitis. But what Dr. Jose testified to is that the standard these doctors were following, and I suspect that's why the government in this case didn't call an independent infectious disease expert, is that if you take culture-negative endocarditis, the Duke criteria which they tout doesn't apply, because you eliminate a major criteria, and you eliminate a minor criteria, and you can never come up with a diagnosis of endocarditis. Is there any evidence in the record that the physicians treating Ms. Rivers in Anchorage knew that this was a misdiagnosis? That they knew it was a misdiagnosis? That's the question. Well, I think that they had all the warning signs there, that they had... That sounds like should have known, and that'll be my next question. Any evidence that they knew? I don't think any of the doctors testified that they knew she had endocarditis. I mean, the government admitted, and it's uncontested fact... Your argument is they should have known. Well, they should have known. You had red lights flashing, you had warning signs. They knew that Dr. Wood and Bethel had diagnosed her with presumed endocarditis, so when she came into the hospital, she had a presumption diagnosis of endocarditis. They came up with no reasonable alternative diagnosis. Dr. Levy testified that once you make a diagnosis of endocarditis, you don't change the diagnosis, you treat the diagnosis. And to change the diagnosis, pregnancy-induced vasculitis is a reckless deviation from the standard of care. Your theory of recklessness in this case is not knowing, but they had reason to know facts which would lead a reasonable man to realize something very bad could happen here. They did. They consciously disregarded these warning signs. It was like driving through the red light. And the other thing is that they made conditions of, we won't release Ms. Rivers unless her labs are stable. Dr. Small, who was the hospitalist, the chief doctor there, who took care of inpatients. But her labs weren't stable. When she was in Bethel, her SED rate was 115, which was high. In Anchorage, when they released her, it was 140. The highest lab test is 140. So we knew that on December 23rd, when they sent her back to Scammon Bay, it was off the charts. And they completely ignored that. They ignored new splinter hemorrhages on her fingers, and we have pictures in the record, but if you take just the differential diagnosis of splinter hemorrhages, the only plausible diagnosis that Ms. Rivers had was endocarditis. Just on that one indication alone that she developed, which Dr. Schnellbacher noted in his chart, that she had new splinter hemorrhages, despite the fact that her other symptoms were improving. So, I mean, this is a case where they had a red flashing light, none of the doctors consulted each other, and they blew through the light. They had warning signs and warning signs, and as you pointed out, Judge Owens, that Dr. Levy said, this is crazy. I mean, the treatment was crazy, and it's not easy as someone who does medical malpractice litigation to get a doctor, a professor of medicine at a hospital, to come into a courtroom and say, these doctors were crazy. That is not easy to get someone to say. He said it was crazy, it was inappropriate, it was reckless. And it was, and Ms. Rivers has to live for that the rest of her life. The case they cite, I mean, there's no disagreement in this case that Restatement 500 applies. The Alaska Supreme Court has consistently adopted that. Judge Holland adopted it. The government's not disputing that. We cite the Storrs versus Lutheran Hospital case, where Alaska, that's a medical case in which there was a gross negligence, but the Alaska Supreme Court said that in that case where there was a failure to treat, failure to diagnose, shock, hemorrhagic shock, that it would meet the definition of recklessness. So I think that the law is pretty clear, even though that this statute hasn't been applied in a case before the Ninth Circuit or before the Alaska Supreme Court. The Restatement 500 would apply, and that Judge Holland properly applied the standard in why this is reckless. The diagnosis when your client arrived in Anchorage was possible, i.e.? No, it was presumed. So Dr. Wood diagnosed her with presumed endocarditis. It was not possible. The doctors at A&MC changed the diagnosis to possible endocarditis. And I think what both my experts said is when they saw her in Bethel, and she had the symptoms of Osler nose, January lesions, a high white blood count, a high BNP rate, a high CRP rate, a high SED rate, she had heart, her mitral valve regurgitation had gotten worse. You take one look at her, any competent doctor would say she has endocarditis. You treat possible endocarditis. And the standard of care for treating possible endocarditis is you treat. Dr. Jose testified, he doesn't know of any infectious disease doctor in the United States that wouldn't treat someone with possible endocarditis. Your view is it doesn't matter whether it was a presumption or a possibility. You treat. You treat possible endocarditis. You had all the signs and symptoms and they didn't do it. You can take one fact of this case. When they released her on December 23rd, the guidelines that they tout say that if you have a suspicion, a suspicion of endocarditis, you have to follow up within seven to ten days and do a repeat echocardiogram. And if you go to the record, SER 317, you look at the follow-up they put for her. It was January 17th for a video conference call. So they sent her home on December 23rd, which was a clear breach of the standard of care. And then my expert said they had another chance to comply with the standard of care. It was a reckless breach of the standard of care to send her home, to not treat her. They had another chance, which was to completely blue, which was reckless because the infectious disease doctors, the hospitalist and the cardiologist didn't follow up with her. The second time around they could have avoided the catastrophic injury that Ms. Rivers had. So there's two clear grounds of recklessness that we have in this case in which ultimately Judge Holland relied upon, relied upon the expert testimony. The case they cite, the Bunting case, I think that's clearly distinguishable. That was a case where, as the government's lawyer points out, that a person took off from the Kodiak airport and went in the water. He was rescued 15 minutes later. He was taken by Coast Guard helicopters, a Coast Guard station. He was treated for 90 minutes by a Coast Guard physician and taken to the hospital. He treated him with hypothermia. He had no diagnosis. He didn't have time. And the district court found it wasn't gross negligence. It's treatment. This case is a case where you have doctors who have a presumed diagnosis of endocarditis. They have plenty of time to get this right. They make up a diagnosis that doesn't exist. They don't follow up. They have these red flashing signs. And it was reckless. So that case is not helpful to the government. The other thing they talk about that's in their brief, I want to address, is this antibiotics. They say, well, there's a risk of treating her with antibiotics. And Dr. Jose debunked that clearly. He said, there's no risk. I've never had anyone die of a PICC line in place. You can have 1% to 2%. A PICC line is a line they put in. They could have put a PICC line in her. They could have sent her home. They could have sent her to a hotel. She didn't have to stay in the hospital for four to six weeks, as the government claims in their brief. He's had no one die of a PICC line. No one die of antibiotic treatment. The court, I think Judge Hawkins, you asked if there was any case. But we cited a series of cases in the Ninth Circuit where this court, the Rust case, the Hussein case, the Prescott case, the Coriolis case, in which the Ninth Circuit has upheld findings of willful misconduct and gives great deference to the trial court. And I think in the Coriolis versus the Tyer case, the court said that you have to be significantly deferential to the lower courts. District courts are inherently better positioned to make such judgments because of their superior vantage point to the evidence. And Judge Holland's a seasoned judge. He's been on the bench for 35 years. He presided over the Exxon Valdez case. He was very thoughtful and conscientious in this case. He took a lot of time writing his order. And let me also point out, they criticized that one paragraph. But if this were a jury trial, the jury would have been given a special interrogatory stand. Were the doctors in this case reckless? They would have checked a buck, yes or no. And then we would have the whole transcript, which would support that finding on appeal. And they're criticizing Judge Holland's, some of his wording. But the whole transcript, Your Honor, supports the finding that they were reckless. And it would be terrible public policy to overturn a district court judge in a finding of recklessness in this case. Thank you. Thank you. Thank you, Your Honors. I have just three quick points. First, in response to one of the questions that was asked about whether the physicians actually knew that she had IE, the district court actually made a finding on page 20 that they believed she did not have IE. And that's they discharged her at that time. Second, as to this issue of presumed IE, definitive IE, possible IE, under the modified Duke criteria, there are three options. There's definitive IE, possible IE, and rejected IE. And this is on page 94 of your excerpts of record in that table right on the top there. So here at Bethel Regional Hospital, Dr. Wood said presumed IE on page 108 of the record. A&MC translated that to possible IE, which is sort of one of the three options for IE. And they treated her for that as the Duke criteria instruct, which is for possible IE, you treat the patient while conducting the additional diagnostic test to determine if she goes in the definitive category or in the rejected category. They attempted to follow the modified Duke criteria, acknowledged that they did so imperfectly. And they determined that based on that possible IE, she should be moved into that rejected IE category because her syndrome resolved within four days, they believed. Third, plaintiff's counsel mentions in this argument for the first time that the modified, that he believes the modified Duke criteria is the wrong standard of care. That's not something that was ever raised in the briefing, and as far as I know, was never raised below. The district court finds on pages 11 and 12 of the opinion that the modified Duke criteria is the correct standard of care, and that's the standard of care that the physicians attempted to follow. If there are no further questions, we ask that this matter be reversed and remanded. Thank you. Thank you, both counsel, for your argument this morning. Agachek v. United States is submitted. Our last case for argument this morning is Greenpeace.
judges: Hawkins, McKeown, Owens